**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

JUNE WEISS, D.M.D., PA,

      Plaintiff,

v.

HARTFORD FINANCIAL SERVICES
GROUP, INC. D/B/A THE HARTFORD
and SENTINEL INSURANCE COMPANY,
LTD.,

      Defendants.

CASE NO.:

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff June Weiss, D.M.D., PA ("Plaintiff"), individually and on behalf of all others similarly situated, upon personal knowledge as to facts pertaining to itself and on information and belief as to all other matters, by and through its undersigned counsel, brings this class action complaint against defendants Hartford Financial Services Group, Inc. d/b/a/ The Hartford and Sentinel Insurance Company, Ltd. (collectively "Defendants").

## PRELIMINARY STATEMENT

Defendants' insurance policy sold to and purchased by Plaintiff is a standard form business policy of insurance for which the COVID-19 event is not excluded.   Plaintiff in this case contends for itself and the class described that (a) the policy language provides coverage for business income losses arising out of a national and/or local total closure of business (as is present here) and (b) Defendants could have, but did not, exclude coverage for a pandemic - a situation known by Defendants to potentially occur (and previously occurred with the SARS outbreak of 2003). Defendants' policy of insurance is to be strictly construed against Defendants and construed, where

reasonable, in favor of coverage.

## NATURE OF THE CASE

1.      This action arises from the denial of commercial insurance benefits due and owing to an insured that suffered significant business interruption and substantial losses as a result of the COVID-19 pandemic.   Plaintiff contracted for and secured insurance that covered losses sustained due to the interruption of business operations but, astonishingly, Defendants take the position that the COVID-19 events – and the direct losses that were caused due to decisions by governmental authorities and other public health officials as a result of the pandemic – are not covered events entitling Plaintiff to coverage under the policies it paid for.

2.      Plaintiff, based at 7216 Bergenline Avenue, North Bergen, NJ 07047, is a dental office.   Plaintiff purchased and renewed, and Defendants issued, Business Insurance Policies, Policy No. 13 SBA IX6443, which are attached hereto as **Exhibit A** (the "2019 Policy") and **Exhibit B** (the "2020 Policy," collectively the "Policies").

3.      The Policies are bilateral contracts.   Plaintiff agreed to pay monthly premiums to Defendants in exchange for Defendants' promises to pay for certain losses.

4.      Among other types of coverage, the Policies provide "Business Income and Extra Expense Coverage" (hereinafter "Business Income Coverage") which promises to pay for loss due to the necessary suspension of operations at a location resulting from a covered cause of loss.   The Business Income Coverage further provides payment for extra expenses incurred during the suspension of business activities from a covered cause of loss.

5.      The Policies also provide "Civil Authority Coverage," which promises to pay for loss caused by necessary suspension of business operation caused by the action of a civil authority

that prohibits access to a location.

6.      The Policies further provide "Limited Fungi, Bacteria or Virus Coverage," which promises to pay for loss or damage caused by a virus up to $50,000.

7.      Plaintiff duly complied with its obligations under the Policies and timely paid the requisite premiums.

8.      Beginning in March of 2020, Plaintiff was forced to suspend business operations as a result of COVID-19, and due to subsequent actions of civil authorities in response to the pandemic.   The suspension of Plaintiff's business caused Plaintiff to suffer significant losses and incur significant damages.

9.      Plaintiff provided Defendants a timely notice of claim for Plaintiff's loses stemming from COVID-19 on or about June 30, 2020 (the "Claim Notice," *see* **Exhibit C**). However, Defendants have failed and refused to honor their obligations under the Policies to cover Plaintiff's losses.   In doing so, Defendants invoke and rely upon terms and conditions of the Policies that do not refer or relate to the COVID-19 pandemic and do not exclude coverage for Plaintiff's claims.

10.      Upon information and belief, Defendants have, on a widespread and uniform basis, refused to compensate their insureds under their Business Income Coverage and Civil Authority Coverage (collectively the "Declarations") for losses incurred due to the COVID-19 pandemic, or due to any orders by civil authorities requiring the suspension or curtailment of insureds' businesses.

11.      This is an action for breach of contract for Defendants' failure to pay insurance proceeds that were and are owing to Plaintiff by Defendants under the Policies, as well as by

3

Defendants to the Class under the Declarations.   This is also an action for declaratory judgment under the Federal Declaratory Judgments Act, 28 U.S.C. §2201-2202 and Rule 57 of the Federal Rules of Civil Procedure.

## **PARTIES**

12.     Plaintiff is a dental office based at 7216 Bergenline Avenue, North Bergen, NJ 07047.

13.     Defendant, Hartford Financial Services Group d/b/a The Hartford (hereinafter "Hartford"), is a corporation organized under the laws of the State of Connecticut, with its principal place of business located at 1 Hartford Plaza, Hartford, Connecticut 06155.   Hartford owns various subsidiaries that issue insurance, including but not limited to property and business insurance.

14.     Defendant, Sentinel Insurance Company, Ltd. (hereinafter referred together with co-defendant Hartford as "Defendants") is a limited corporation, organized under the laws of the State of Connecticut, with its principal place of business located at 1 Hartford Plaza, Hartford, Connecticut 06155.

15.     Sentinel Insurance is a subsidiary of Hartford and is licensed and otherwise qualified to issue insurance in the State of New Jersey, regularly engages in substantial business activities in the State of New Jersey and derives substantial revenue from such business activities in the State of New Jersey.

16.     On August 27, 2020, Defendants denied Plaintiff's insurance claim through a letter on Hartford letterhead (the "Claim Rejection Letter"), *see* **Exhibit D**, signed by a representative with a Hartford email address.

4

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action under 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act of 2005 ("CAFA"), because the aggregate amount in controversy exceeds $5 million (exclusive of interest and costs), and at least one class member (as well as the Plaintiff itself) is a citizen of a different state than that of Defendants; hence there is at least minimal diversity between the parties.   In addition, there are well over 100 class members in the expected Class.

18.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § l332(a) because Plaintiff has a complete diversity of citizenship from Defendants (Plaintiff is a citizen of New Jersey and Defendants are citizens of Connecticut), and the amount in controversy exceeds $75,000.00.

19.     The Court has personal jurisdiction over Defendants because Defendants engage in substantial business activities, and derive substantial revenue from such business activities, in the State of New Jersey.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 139l(b) because a substantial portion of the acts giving rise to this action occurred in this District.

## FACTUAL BACKGROUND

**A.     The Pandemic**

21.     As a result of the global pandemic known as COVID-19, over 200,000 Americans have died and countless other have suffered unimaginably.   Economically, Americans and American businesses have sustained unprecedented losses.

22.     COVID-19 began in Wuhan, China, when medical personnel determined that patients were experiencing severe, life-threatening symptoms including respiratory distress, pneumonia and, in some cases, organ failure and death.

23.     As more information was gathered about what came to be known as SARS-Cov-2, epidemiologists determined that the illness experienced by residents of Wuhan was actually a novel coronavirus similar structurally to the virus that caused SARS (a/k/a SARSr-CoV) in China circa 2002-2004.   Given that SARS was also a respiratory illness spread rapidly through contact with infected respiratory droplets, fomites (objects that can carry live viral molecules) and other means, and given that the virus was spread at high transmission rates (a/k/a "R0" or "r-naught"), the virus garnered the attention of various global and domestic governmental and intergovernmental entities including the World Health Organization (WHO) and the Centers for Disease Control (CDC).   These entities, based on information gathered in Wuhan, China, suspected that what was later known as SARS-Cov-2 or COVID-19 would be transmitted between people much the same way SARS was transmitted in 2002-2004.

24.     Given the potential lethality of the virus based on epidemiological research on SARS, global and governmental entities began mounting a response.   Unfortunately for the United States, domestic response was markedly slower than other areas of the world, allowing for domestic transmission of the virus to individuals in the United States.

25.     The first confirmed case of COVID-19 in the United States (a/k/a U.S. Patient Zero) was documented on January 20, 2020 in Washington State.   The patient was a man who had returned to the U.S. from Wuhan, China on January 15, 2020.

26.     Soon after COVID-19 made its way to U.S. soil, additional cases were confirmed

6

in the United States.  Globally, virus numbers began to grow exponentially.  Health authorities

in the United States feared that exponential growth of domestic cases would soon follow.

27.     Globally, the percentage of COVID-19 cases that resulted in patient fatality (a/k/a

"case fatality ratio") began to climb.  Authorities postulated that growth of the case fatality ratio

was in part due to strained healthcare resources as case numbers increased.

28.     Information evolved showing that COVID-19 produced severe complications in a

significant portion of cases, requiring the use of vital lifesaving equipment, such as ventilators,

and medical personnel trained to use the same.  Scientists could not determine a clear global case

fatality ratio because fatality rates varied widely from country to country based on the magnitude

and impetus of each country's response, as well as idiosyncratic factors.

29.     Global health authorities began advising that the number of cases would soon

overwhelm strained medical resources.

30.     In the United States, confirmed cases of COVID-19 began to grow exponentially

as feared by scientists and epidemiologists.  With the growth in confirmed cases, case fatalities

increased.  Information regarding the virus evolved daily.  Authorities in the U.S. discovered that

the nation was ill-equipped to respond to the virus.  National health authorities recognized the

grim reality that U.S. capacity to care for critically ill patients was woefully lacking and that

without significant, widespread action from all Americans, the healthcare system would soon be

overwhelmed by patients needing critical lifesaving equipment.

31.     Such a scenario would lead to a rapid rise in the case fatality ratio, resulting in the

deaths of potentially millions of Americans.

32.     In early March 2020, the federal government issued guidance through the CDC

regarding gatherings of large people and other measures to slow the spread of COVID-19.   The guidance left binding executive action to the states to regulate how each state would respond to the growing epidemic.

33.   The guidance from the CDC, operating with a dearth of information regarding the new deadly and fast-spreading virus, necessarily resorted to measures requiring "social distancing" to reduce COVID-19 related fatalities.   This "social distancing" response guidance necessitated the closure of business, restrictions on gatherings of people, and the cooperation of Americans to remain at home unless absolutely necessary.   The CDC's goal in issuing this guidance was to reduce the spread of COVID-19 such that the healthcare system would not become overwhelmed and patients could be adequately cared for, thereby reducing the overall case fatality ratio.   This has been commonly referred to as "flattening the curve."

34.   Were it not for social distancing measures, the number of Americans infected with COVID-19 would continue to grow exponentially, quickly overwhelming the American healthcare system's capacity to care for patients.   Without adequate care, both the gross number, as well as the case fatality ratio, would grow significantly, resulting in untold loss of life.

35.   Numerous private organizations, recognizing the need for swift action, responded to CDC guidance on the reduction of the spread of COVID-19 by voluntarily closing their businesses, cancelling events, and asking employees to remain home in advance of binding executive action.

36.   In turn, each state, through its governor and/or local authorities, issued executive orders closing all but "essential" businesses, restricting travel and gatherings, closing various business and social activities including trade shows and sporting events, closing parks and other

recreation, and taking other measures to prevent the spread of COVID-19.   While differing governmental agencies exercised the oversight and implementation of these orders with regard to particular industries, the effect of these orders was to universally close "non-essential" businesses across the country.

37.     On March 16, 2020, New Jersey Governor Philip D. Murphy signed Executive Order #104, implementing a series of restrictions upon businesses and activities by the public in the State of New Jersey's efforts to curtail the spread of COVID-19.   *See* **Exhibit E**.   Executive Order #104 was premised upon a series of findings, including that "social mitigation strategies for combatting COVID-19 requires every effort to reduce the rate of community spread of the disease."   Executive Order #104 went on to order the closure of schools throughout the State of New Jersey, as well as to restrict gatherings of persons in New Jersey to no more than fifty people and limit the operating hours of non-essential businesses across the State.

38.     Just five days later on March 21, 2020 – as the spread of COVID-19 continued to worsen in New Jersey – Governor Murphy signed Executive Order #107, requiring that "all New Jersey residents shall remain home," unless residents were engaging in extremely limited activities such as procuring food or reporting to an employment role designated as essential in nature.   *See* **Exhibit F**.   Executive Order #107 further required that "when in public, individuals must practice social distancing and stay six feet apart, whenever practicable…"

39.     Also on March 21, 2020, the New Jersey State Board of Dentistry issued a COVID-19 Advisory for New Jersey Dental Professionals stating that "dentists should cancel or postpone *any* elective procedure or "routine" service until at least April 20, 2020, to limit exposure to and transmission of the virus and help preserve and extend the supply of personal protective

equipment." *See* **Exhibit G** (emphasis added).

40.    As the spread of COVID-19 continued to increase in a staggering rate of new infections, Governor Murphy signed Executive Order #109 on March 23, 2020, which put into action the Governor's plan to temporarily halt all elective surgeries and invasive medical procedures across the State, "whether medical or dental."   *See* **Exhibit H**.

41.    Advising New Jersey dental professionals as to how best to adhere to the above governmental orders, the New Jersey Dental Association issued an advisory to dental practitioners on April 15, 2020 titled "Date for Re-Opening of Dental Offices to Routine Care Postponed Indefinitely as per Governor's Executive Order."[1]   In pertinent part, this statement advised the Garden State's dentists that "since the 'indefinite cancellation or postponement' mandated in the Executive Order [#109] has not been relaxed and based upon a continuing need to limit containment of the virus, pending further direction from the Governor, dental offices should not 're-open' on April 20…"

42.    As a result of the swift, voluntary action of private organizations based on CDC guidance, as well as later executive action, the spread of COVID-19 was temporarily limited. However, as of the date of this Complaint, the number of cases, and the concomitant number of deaths, has remained steady and potentially begun to rise, signaling the likelihood of a "second wave" projected by medical experts.

43.    Unfortunately, as a consequence of these life-saving measures, millions of Americans have experienced severe economic loss and hardship.   The unemployment rate has

---

1 *See* https://www.njda.org/covid-19-updates/economic-and-state-guidance/2020/04/15/alert. (last accessed on 10/7/2020).

skyrocketed to levels not seen since the Great Depression.

44. Trillions of dollars of economic activity have been lost, and the losses continue to mount daily.

**B. Plaintiff's Business and Operations and the Impact of COVID-19**

45. Plaintiff is a small business that primarily renders routine, elective and otherwise non-emergency dental services to patients. Plaintiff has been operating since 1996 and has grown into a successful business since that time.

46. As result of this wave of COVID-19 amidst the beginning of the pandemic, and due to the actions taken by local authorities and public health officials to slow the spread of the disease during that time, Plaintiff was forced to entirely halt its business activities until on or about May 26, 2020. Since then, patients have been permitted to return to Plaintiff's office, but due to the continuing pandemic business is down significantly.

47. Plaintiff derives its sole income from services provided to dental patients. The inability to provide these services caused Plaintiff significant business losses, costs and damages.

48. Accordingly, Plaintiff provided its Claim Notice on June 30, 2020, stating that Plaintiff's business operation sustained lost profits, lost sales, damage to equipment from non-use, additional expenses, mitigation costs including salaries, and other new fixed and variable expenses. *See* Ex. C at 1.

**C. The Policies**

49. Plaintiff entered into a contract with Defendants governing the terms, conditions, and obligations of the Policies. The entirety of the Policies, including all coverage Plaintiff obtained, is described in full in the attached Exhibits A and B.

50.     Plaintiff timely paid all applicable premiums, and the 2019 Policy became effective on April 12, 2019.   The 2019 Policy was subsequently renewed by Plaintiff, and the 2020 Policy took effect on April 12, 2020.   The Policies have been active during all applicable periods and remain active to date.

51.     Plaintiff did not participate in the drafting or negotiation of the words used in the Policies.

52.     As the insured, Plaintiff had no leverage or bargaining power to alter or negotiate the terms of the Policies.

53.     The Policies provide, as part of the Business Income Coverage purchased by Plaintiff, in part: "we will pay for the actual loss of business income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.'"   Ex. A at 38; Ex. B at 39.

54.     The Policies' Business Income Coverage also provides that "we will pay for reasonable and necessary Extra Expense you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or physical damage to property at the 'scheduled premises.'"   Ex. A at 38; Ex. B at 39.

55.     The Policies' Business Income Coverage also provides, as part of the Extended Business Income Coverage, that "if the necessary suspension of your 'operations' produces a Business Income loss . . . payable under this policy, we will pay for the actual loss of Business Income you incur . . . loss of Business Income must be caused by direct physical loss or physical damage at the 'scheduled premises' caused by or resulting from a Covered Cause of Loss."   Ex. A at 39, Ex. B at 40.

56.     The Policies further provide, as part of the Civil Authority Coverage purchased by Plaintiff, that Defendants will pay for "the actual loss of Business Income you sustain when access to your 'scheduled premises' is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your 'scheduled premises.'" Ex. A at 39; Ex. B at 40.

57.     The COVID-19 pandemic caused direct physical loss of or damage to the Covered Property under the Policies.

58.     The COVID-19 pandemic renders the Covered Property unsafe, uninhabitable, or otherwise unfit for its intended use, which constitutes direct physical loss.

59.     Plaintiff's loss of use of the Covered Property also constitutes direct physical loss.

60.     Plaintiff's Business Income Coverage within the Policies was triggered.

61.     Plaintiff's Policies do not contain any exclusion that would apply to allow Defendants to deny coverage for losses caused by COVID-19 and related actions of civil authorities taken in response to COVID-19.

62.     In its Claim Rejection Letter (Ex. D) at page 3, Defendants cited the applicability of a virus exclusion to the circumstances surrounding the Plaintiff's losses:

> We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:
>
> > (1)     Presence, growth, proliferation, spread or any activity of "fungi", wet rot, dry rot, bacteria or virus.

63.     This basis for the denial of Plaintiff's insurance claim ignores Plaintiff's own assertions to Defendants that there was no evidence to suggest the presence of coronavirus at the scheduled premises.   Indeed, Plaintiff contends that losses occurred as the result of the global

pandemic – and the governmental closure orders aimed at preventing the spread of COVID-19.

64.     To the extent that Defendants do claim that viruses cannot cause physical loss of or damage to property, this proposition is turned on its head by the very inclusion of a virus exclusion within endorsements to the Plaintiff's *property* coverage.

65.     The insurance industry has recognized that the presence of virus or disease can constitute physical loss of, or damage to, property since at least 2006.   When preparing so-called "virus" exclusions to be placed in some policies, but not others, the insurance industry drafting arm, ISO, circulated a statement to state insurance regulators that included the following:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property.   When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses.   Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage.   An allegation of property damage may be a point of disagreement in a particular case.

66.     Also in the Claim Rejection Letter, Defendants stunningly claimed that the Policies' exclusion for "Pollution" "could" operate to deny Plaintiff's claims.   *See* Ex. D at 2. But the language of the Pollution exclusion clearly shows it does not apply:

> Pollution: We will not pay for loss or damage caused by or resulting from the discharge, dispersal, seepage, migration, release or escape of "pollutants and contaminants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss."   But if physical loss or physical damage by the "specified causes of loss" results, we will pay for the resulting physical loss or physical damage caused by the "specified cause of loss."

*Id.* "Pollutants and Contaminants" are defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapors, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."   This exclusion clearly does not

cover Plaintiff's claims relating to the COVID-19 pandemic.

67.     Plaintiff has sustained severe economic hardship as a result of the COVID-19 pandemic.

68.     Due to the existence of COVID-19 and the related pandemic, and the actions of governmental authorities and public health officials in the jurisdictions in which Plaintiff conducts business, Plaintiff has lost the use of its insured property and the insured property does not function as intended.   As such, Plaintiff has sustained physical loss or damage due to the actions of private actors and organizations responding to governmental guidance and/or orders of federal, state, and local government prohibiting Plaintiff from carrying on its business.

69.     Plaintiff sustained physical loss or damage from the loss of patients as a result of closing Plaintiff's business due to the actions of governmental entities and to the stay-at-home and social distancing compliance required of the public by such entities.

70.     Business income and extra expenses are defined in the Policies held by Plaintiff and are covered property pursuant to the Policies. *See* Exs. A and B.

71.     On information and belief, Defendants have engaged in the same misconduct, alleged herein with respect to Plaintiff, in connection with claims submitted by numerous of Defendants' insureds who have suffered losses related to the pandemic and submitted claims which were categorically denied.

72.     Plaintiff's claims and those of the proposed Class all arise from a single course of conduct by Defendants: their systematic and blanket refusal to provide any coverage for business losses related to the COVID-19 pandemic, and the suspension of business operations by civil authorities in response to the pandemic.

73.     Defendants' wrongful conduct alleged herein has caused significant damage, and if left unchecked will continue to cause significant damage, to Plaintiff and the Class.

## CLASS ALLEGATIONS

74.     Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and (c)(4) individually and on behalf of all others similarly situated.

75.     Plaintiff seeks to represent nationwide classes defined as follows:

- All persons and entities that: (a) had Business Income Coverage under a property insurance policy issued by Defendants; (b) suffered a suspension of business related to COVID-19, at premises covered by their property insurance policy issued by Defendants; (c) suffered loss of business income and/or necessary extra expense; (d) made a claim under their property insurance policy issued by Defendants; and (e) were denied Business Income Coverage by Defendants for the suspension of business resulting from the presence or threat of COVID-19 (the "Business Income Coverage Breach Class").

- All persons and entities that: (a) had Civil Authority Coverage under a property insurance policy issued by Defendants; (b) suffered loss of business income and/or necessary extra expense caused by action of a civil authority; (c) made a claim under their property insurance policy issued by Defendants; and (d) were denied Civil Authority Coverage by Defendants for the loss of business income and/or necessary extra expense caused by action of a civil authority (the "Civil Authority Coverage Breach Class").

- All persons and entities that had Business Income Coverage under a property insurance policy issued by Defendants and suffered a suspension of business related to COVID-19 at premises covered by their property insurance policy issued by Defendants (the "Business Income Coverage Declaratory Judgment Class").

- All persons and entities that had Civil Authority Coverage under a property insurance policy issued by Defendants and suffered loss of business income and/or necessary extra expense caused by action of a civil authority (the "Civil Authority Coverage Declaratory Judgment Class").

76.     In the alternative, Plaintiff also seeks to represent the following New Jersey subclasses:

- All persons and entities in New Jersey that: (a) had Business Income Coverage under a property insurance policy issued by Defendants; (b) suffered a suspension of business related to COVID-19, at premises covered by their property insurance policy issued by Defendants; (c) suffered loss of business income and/or necessary extra expense; (d) made a claim under their property insurance policy issued by Defendants; and (e) were denied Business Income Coverage by Defendants for the suspension of business resulting from the presence or threat of COVID-19 (the "New Jersey Business Income Coverage Breach Subclass").

- All persons and entities in New Jersey that: (a) had Civil Authority Coverage under a property insurance policy issued by Defendants; (b) suffered loss of business income and/or necessary extra expense caused by action of a civil authority; (c) made a claim under their property insurance policy issued by Defendants; and (d) were denied Civil Authority Coverage by Defendants for the loss of business income and/or necessary extra expense caused by action of a civil authority (the "New Jersey Civil Authority Coverage Breach Subclass").

- All persons and entities in New Jersey that had Business Income Coverage under a property insurance policy issued by Defendants and suffered a suspension of business related to COVID-19 at premises covered by their property insurance policy issued by Defendants (the "New Jersey Business Income Coverage Declaratory Judgment Subclass").

- All persons and entities in New Jersey that had Civil Authority Coverage under a property insurance policy issued by Defendants and suffered loss of business income and/or necessary extra expense caused by action of a civil authority (the "New Jersey Civil Authority Coverage Declaratory Judgment Subclass").

The above nationwide classes and New Jersey subclasses are collectively referred to as the "Class" or the "Classes."   Excluded from the Class are: (i) Defendants and their officers and directors, agents, affiliates and subsidiaries; (ii) all Class members that timely and validly request exclusion from the Class; and (iii) the Judge presiding over this action.   Plaintiff reserves the right to revise the definitions of the Classes based upon newly available information, including information obtained through discovery, or as otherwise may be appropriate.

77.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as

17

would be used to prove those elements in individual actions alleging the same claims.

78.     The members of each of the Classes are so numerous that joinder of the members of each of the Classes would be impracticable.

79.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.   Such common questions of law or fact include, *inter alia*:

a.     Whether Defendants engaged in the conduct alleged;

b.     Whether Defendants' Business Income Coverage applies to a suspension of business caused by COVID-19 and/or related actions of civil authorities taken in response to the presence or threat of COVID-19;

c.     Whether Defendants' Civil Authority Coverage applies to loss of business income caused by the orders of local, municipal, city, county, and/or state or national governmental entities requiring the suspension of business during the outbreak of COVID-19 in the United States;

d.     Whether Plaintiff and the Class are entitled to a declaratory judgment as to the meaning of their Policies;

e.     Whether Defendants have breached their contracts of insurance through a blanket denial of all claims based on business interruption, income loss or closures related to COVID-19; and

f.     Whether Plaintiff and the Class members have been damaged and, if so, the measure of such damages.

80.     Plaintiff's claims are typical of the other Class members' claims because Plaintiff and the other Class members are all similarly affected by Defendants' refusal to pay under their Business Income and Civil Authority Coverages.   Plaintiff's claims are based upon the same legal theories as those of the other Class members.   Plaintiff and the Class members were injured through the substantially uniform misconduct of Defendants as described above.   Plaintiff is advancing the same claims and legal theories on behalf of itself and all Class members.

81.     Plaintiff is an adequate Class representative because its interests do not conflict with the interests of the other Class members it seeks to represent; it has retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiff intends to prosecute this action vigorously.   The interests of the Class members will be fairly and adequately protected by Plaintiff and its counsel.

82.     A class action is also warranted under Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members.

83.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.   The damages or other detriment suffered by Plaintiff and the Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct.   Even if Class members could afford individual litigation, the court system should not be required to undertake such an unnecessary burden.   Individualized litigation would also create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

**COUNT I**
**DECLARATORY JUDGMENT - BUSINESS INCOME COVERAGE**
(On Behalf of Business Income Coverage Declaratory Judgment Class or, in the alternative,
New Jersey Business Income Coverage Declaratory Judgment Subclass)

84.     Plaintiff incorporates by reference all allegations set forth in paragraphs 1-83 as if fully set forth herein.

85.     Plaintiff's Policies, as well as those of other Business Income Coverage Declaratory Judgment Class members, are contracts under which Defendants were paid premiums in exchange for Defendants' promise to pay Plaintiff and other Business Income Coverage Declaratory Judgment Class members' losses for claims covered by the Policies.

86.     Plaintiff and the other Business Income Coverage Declaratory Judgment Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Defendants, or Defendants are estopped from asserting them, and yet Defendants have abrogated their insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and have wrongfully and illegally refused to provide coverage to which Plaintiff and the other Business Income Coverage Declaratory Judgment Class members are entitled.

87.     Defendants have denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Business Income Coverage Declaratory Judgment Class have filed a claim.

88.     As described herein, an actual case or controversy exists regarding Plaintiff and the other Business Income Coverage Declaratory Judgment Class members' rights and Defendants' obligations under the Policies to reimburse Plaintiff for business losses incurred by Plaintiff and

the other Business Income Declaratory Judgment Class members in connection with suspension of their businesses stemming from the COVID-19 pandemic.

89.     Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Business Income Declaratory Judgment Class members seek a declaratory judgment from this Court declaring that Plaintiff's and the other Business Income Coverage Declaratory Judgment Class members' business income losses and extra expenses incurred in connection with the impairment and/or obstruction of business stemming from the COVID-19 pandemic are insured losses under their Policies.

**COUNT II**
**DECLARATORY JUDGMENT - CIVIL AUTHORITY COVERAGE**
(On Behalf of Civil Authority Coverage Declaratory Judgment Class or, in the alternative,
New Jersey Civil Authority Declaratory Judgment Coverage Subclass)

90.     Plaintiff incorporates by reference all allegations set forth in paragraphs 1-83 as if fully set forth herein.

91.     Plaintiff's Policies, as well as those of other Civil Authority Coverage Declaratory Judgment Class members, are contracts under which Defendants were paid premiums in exchange for Defendants' promise to pay Plaintiff and other Civil Authority Coverage Declaratory Judgment Class members' losses for claims covered by the Policies.

92.     Plaintiff and the other Civil Authority Coverage Declaratory Judgment Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Defendants, or Defendants are estopped from asserting them, and yet Defendants have abrogated their insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and have wrongfully and illegally refused to provide coverage to which Plaintiff and the other Civil Authority Coverage Declaratory Judgment Class members are entitled.

93.     Defendants have denied claims related to COVID-19 on a uniform and class wide

basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Civil Authority Coverage Declaratory Judgment Class have filed a claim.

94.     As described herein, an actual case or controversy exists regarding Plaintiff and the other Civil Authority Coverage Declaratory Judgment Class members' rights and Defendants' obligations under the Policies to reimburse Plaintiff for business losses and necessary extra expenses incurred by Plaintiff and the other Civil Authority Declaratory Judgment Class members caused by the orders of local, municipal, city, county, and/or state or national governmental entities requiring the suspension of business during the outbreak of COVID-19 in the United States.

95.     Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Civil Authority Declaratory Judgment Class members seek a declaratory judgment from this Court declaring that Plaintiff's and the other Civil Authority Coverage Declaratory Judgment Class members' business income losses and extra expenses caused by the orders of local, municipal, city, county, and/or state or national governmental entities requiring the suspension of business during the outbreak of COVID-19 in the United States are insured losses under their Policies.

**COUNT III**
**BREACH OF CONTRACT - BUSINESS INCOME COVERAGE**
(On Behalf of Business Income Coverage Breach Class or, in the alternative,
New Jersey Business Income Coverage Breach Subclass)

96.     Plaintiff incorporates by reference all allegations set forth in paragraphs 1-83 as if fully set forth herein.

97.     Plaintiff's Policies, as well as those of other Business Income Coverage Breach Class members, are contracts under which Defendants were paid premiums in exchange for Defendants' promise to pay Plaintiff and other Business Income Coverage Breach Class members'

losses for claims covered by the Policies.

98.     In the Policies' Business Income Coverage declaration, Defendants agreed to pay for any actual loss of business income and necessary extra expense sustained due to the necessary suspension of operations at a location if access to such location is impaired or obstructed.

99.     During the period of the Policies, Plaintiff sustained direct physical loss to covered property and other losses, costs and damages resulting from the suspension of business operations due to the impairment and/or obstruction of the business by acts and decisions of governmental authorities and public health officials as a result of the COVID-19 pandemic.   Losses caused by COVID-19 thus triggered the Business Income Coverage provision of Plaintiff's and the other Business Income Coverage Breach Class members' Policies.

100.     Plaintiff and the other Business Income Coverage Breach Class members have complied with all conditions precedent and applicable provisions of the Policies (including providing notification to Defendants of Plaintiff's losses) and/or those provisions have been waived by Defendants, or Defendants are estopped from asserting them, and yet Defendants have abrogated their insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and have wrongfully and illegally refused to provide coverage to which Plaintiff and the other Business Income Coverage Breach Class members are entitled.

101.     By denying coverage for any business income losses and extra expenses incurred by Plaintiff and the other Business Income Coverage Breach Class members in connection with the COVID-19 pandemic, Defendants have breached their coverage obligations under the Policies.

102.     Defendants' failure to pay for the covered losses of Plaintiff and the Business Income Coverage Breach Class members is a material breach of the Policies.

23

103.     As a result of Defendants' material breach of the Policies contract, Plaintiff and the other Business Income Coverage Breach Class members have sustained substantial damages for which Defendants are liable, in an amount to be established at trial.

### COUNT IV
### BREACH OF CONTRACT - CIVIL AUTHORITY COVERAGE
(On Behalf of Civil Authority Coverage Breach Class or, in the alternative,
New Jersey Civil Authority Coverage Breach Subclass)

104.     Plaintiff incorporates by reference all allegations set forth in paragraphs 1-83 as if fully set forth herein.

105.     Plaintiff's Policies, as well as those of other Civil Authority Coverage Breach Class members, are contracts under which Defendants were paid premiums in exchange for Defendants' promise to pay Plaintiff and other Civil Authority Coverage Breach Class members' losses for claims covered by the Policies.

106.     In the Policies' Civil Authority Coverage declaration, Defendants agreed to pay for business losses and necessary extra expenses incurred by Plaintiff and the other Civil Authority Breach Class members caused by the orders of local, municipal, city, county, and/or state or national governmental entities requiring the suspension of business during the outbreak of COVID-19 in the United States.

107.     During the period of the Policies, Plaintiff sustained direct physical loss to covered property and other losses, costs and damages caused by the orders of local, municipal, city, county, and/or state or national governmental entities requiring the suspension of business during the outbreak of COVID-19 in the United States.   Losses caused by COVID-19 thus triggered the Civil Authority Coverage provision of Plaintiff's and the other Civil Authority Coverage Breach Class members' Policies.

108.    Plaintiff and the other Civil Authority Coverage Breach Class members have complied with all conditions precedent and applicable provisions of the Policies (including providing notification to Defendants of Plaintiff's losses) and/or those provisions have been waived by Defendants, or Defendants are estopped from asserting them, and yet Defendants have abrogated their insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and have wrongfully and illegally refused to provide coverage to which Plaintiff and the other Civil Authority Coverage Breach Class members are entitled.

109.    By denying coverage for any business income losses and extra expenses incurred by Plaintiff and the other Civil Authority Coverage Breach Class members caused by the orders of local, municipal, city, county, and/or state or national governmental entities requiring the suspension of business during the outbreak of COVID-19 in the United States, Defendants have breached their coverage obligations under the Policies.

110.    Defendants' failure to pay for the covered losses of Plaintiff and the Civil Authority Coverage Breach Class members is a material breach of the Policies.

111.    As a result of Defendants' material breach of the Policies' contract, Plaintiff and the other Civil Authority Coverage Breach Class members have sustained substantial damages for which Defendants are liable, in an amount to be established at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

a.    Entering an order certifying the proposed nationwide classes, designating Plaintiff as Class Representative, and appointing Plaintiff's attorneys as Counsel for the

Classes;

b.    Entering declaratory judgments on Counts I-II in favor of Plaintiff and the members of the Business Income Coverage Declaratory Judgment Class and Civil Authority Coverage Declaratory Judgment Class providing that:

        i.    Business Income Coverage and Civil Authority Coverage losses stemming from the COVID-19 pandemic are insured losses under the Policies; and

        ii.    Defendants are obligated to pay for the Classes' Business Income Coverage and Civil Authority Coverage losses incurred and to be incurred related to COVID-19.

c.    Entering judgment on counts III-IV in favor of Plaintiff and the Business Income Coverage Breach Class and Civil Authority Coverage Breach Class, and awarding damages for breach of contract in an amount to be determined at trial;

d.    Ordering Defendants to pay pre- and post-judgment interest on any amounts awarded;

e.    Ordering Defendants to pay attorneys' fees and costs of suit; and

f.    Ordering any further relief the Court deems necessary and proper.

## **JURY TRIAL DEMANDED**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests a trial by jury on all issues so triable.

Dated: October 14, 2020

                              **CALCATERRA POLLACK LLP**

                              _/s/ *Janine L. Pollack*_
                              Janine L. Pollack
                              Michael Liskow
                              Justin Teres
                              **CALCATERRA POLLACK LLP**
                              1140 Avenue of the Americas, 9th Floor
                              New York, NY 10036-5803
                              Tel.: (212) 969-7811
                              Fax: (332) 206-2073
                              Email: jpollack@calcaterrapollack.com

Email: mliskow@calcaterrapollack.com
Email: jteres@calcaterrapollack.com

*Counsel for Plaintiff and the Proposed Class*